1

2

3

4

5                    UNITED STATES BANKRUPTCY COURT

6                    EASTERN DISTRICT OF CALIFORNIA

7                         SACRAMENTO DIVISION

8

9

10

11  In re                        )   Case No. 16-21585-A-11
                                 )
12                               )
    AIAD SAMUEL and HODA SAMUEL,  )
13                               )
                                 )
14           Debtors.            )
                                 )
15                               )
                                 )
16  _____    )

17                           **MEMORANDUM**

18       The motions of debtor Hoda Samuel (Mrs. Samuel), found at

19  Dockets 1122 and 1123, and of debtor Aiad Samuel (Mr. Samuel),

20  found at Dockets 1121 and 1159, seek to remove the chapter 11

21  trustee, Scott M. Sackett.[1]  For the reasons explained below,

22  these motions will be denied.

23       The debtors' reasons for seeking removal of the trustee also

24  double as objections to confirmation of the trustee's chapter 11

25  _____

26       [1]  These motions also sought the recusal of Judge Michael
    McManus.  This aspect of the motions were dealt with separately.
27  Memorandum Decisions and final orders denying the motions insofar
    as they requested recusal were entered on August 7 and 23.
28  Dockets 1145, 1148, 1150, 1174, 1175, 1180.

plan.  Their plan confirmation objections will be overruled as
well.  Separate orders, however, will be entered on the motions
to remove the trustee and on the motion to confirm the plan.

I

The debtors' reasons for seeking removal of the trustee and
objecting to the confirmation of the plan fall into four
categories: (1) the trustee should not have paid the United
States of America's criminal restitution claim against Mrs.
Samuel; (2) the trustee, his attorneys, and Judge Michael McManus
are part of a "gang" that has acquired the debtors' four shopping
centers at bargain prices; (3) the trustee sold the shopping
centers on the cheap; and (4) the trustee was and is, at the
worst, dishonest and, at best, a poor manager of the estate.

II

The debtors filed this chapter 11 bankruptcy case on March
15, 2016, in order to prevent the United States of America from
enforcing its approximately $3.2 million criminal restitution
claim against the debtors' assets.  When the debtors failed to
comply with basic chapter 11 requirements and demonstrated a
disregard for the rules governing debtors in possession, the
court appointed a trustee to effectuate the orderly
administration of the bankruptcy estate.  Docket 1148 at 6-8.

III

11 U.S.C. § 324(a) prescribes that "[t]he court, after
notice and a hearing, may remove a trustee, other than the United

States trustee, or an examiner, for cause."

Removal of the trustee for cause is at the discretion of the bankruptcy court.   In the words of the Ninth Circuit:

"'*Once assigned to a particular case, a panel trustee can be removed from a pending case only if the bankruptcy court finds "cause" after notice and a hearing.' Brooks v. United States, 127 F.3d 1192, 1193 (9th Cir. 1997); 11 U.S.C. § 324(a). '[A]lthough sufficient cause is not defined in the Bankruptcy Code, it is left for the courts to determine on a case by case basis.' 3 Collier on Bankruptcy ¶ 324, 02, at 324-3 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.2006).*

"*It is well established that 'cause' may include trustee incompetence, violation of the trustee's fiduciary duties, misconduct or failure to perform the trustee's duties, or lack of disinterestedness or holding an interest adverse to the estate. Id. at 324-3 to 324-4. Such cause must be supported by specific facts, Schultz Mfg. Fabricating Co., 956 F.2d at 692, and the party seeking removal has the burden to prove them. Alexander v. Jensen-Carter (In re Alexander), 289 B.R. 711, 714 (8th Cir. BAP 2003), aff'd, 80 Fed.Appx. 540 (8th Cir. 2003). This listing is illustrative, but not exhaustive.*

"*In relevant part, the Code defines a 'disinterested person' as one that: (E) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or*

1    *interest in, the debtor . . ., or for any other reason.*

2    *"11 U.S.C § 101(14)(E)."*

3    <u>Dye v. Brown (In re AFI Holding, Inc.)</u>, 530 F.3d 832, 845 (9th

4    Cir. 2008).

5

6                                   IV

7         Before delving into the debtors' reasons for the removal of

8    the trustee and their rejection of the trustee's proposed plan of

9    liquidation, it must be pointed out that they have produced no

10   admissible evidence to support their accusations.

11        The debtors were given the opportunity to present evidence.

12   The hearings were continued in order to give them ample time to

13   present evidence.  Yet, they filed no affidavits or declarations

14   and Mr. Samuel refused to call any witnesses or even to identify

15   them because he claimed they were "in fear."  Mr. Samuel

16   articulated no reasons or basis for this fear.  Nor could he

17   explain why he was unable to subpoena these witnesses.

18        Instead, Mr. Samuel relied upon his own testimony to

19   substantiate the motions to remove the trustee and his objections

20   to the plan.  When the trustee sought to question him about his

21   testimony, however, Mr. Samuel refused to be cross examined.

22   Given his refusal to be cross examined, the court will not

23   consider his direct testimony.

24        But, even if the court were to consider Mr. Samuel's

25   testimony, it was not credible.  It was, on the whole,

26   uncorroborated, bizarre, and lacked any basis in reality.

27        For example, the debtors have made multiple accusations that

28   their shopping center properties were purchased by individuals

                                    4

related to or associated with the trustee and/or Judge McManus. The debtors have not come forward with any evidence showing or even suggesting that any of the buyers, or even the other unsuccessful bidders, are related or otherwise connected to the trustee or Judge McManus.

**A**

The debtors assert that the trustee should not have paid the United States of America's criminal restitution claim against Mrs. Samuel.

Mr. Samuel first argues that the trustee should have objected to this claim and not paid it from his share of the assets owned jointly with Mrs. Samuel because the restitution was assessed only against Mrs. Samuel.

However, the court has previously determined that the restitution was assessed against Mrs. Samuel for conduct that occurred while she was married to Mr. Samuel and it is a claim against their marital community. Therefore, it may be satisfied from their community property. All property of the bankruptcy estate administered by the trustee is the community property of the debtors. See August 7, 2018 Memorandum, Docket 1148, at 12-13, 23.

The debtors next argue that the restitution claim should not have been paid because it was not calculated correctly. Mrs. Samuel claims that the Federal Deposit Insurance Corporation did not sustain approximately $3 million in damages and therefore the district court's restitution award is erroneous. However, whether or not this is true, Mrs. Samuel's criminal conviction

and the restitution award have been affirmed by the Ninth Circuit
Court of Appeals and the Supreme Court has rejected any further
appeal.  The judgment giving rise to the restitution claim is
final.

Mrs. Samuel next asserts that the United States agreed to
compromise the restitution award.  However, the court has seen no
evidence of a compromise that supplants the district court's
restitution judgment.  Mrs. Samuel may be referring to a
compromise of a forfeiture judgment against her, not the
restitution award.  Restitution and forfeiture are distinct
remedies serving different objectives.  See United States v.
Newman, 659 F.3d 1235, 1241 (9th Cir. 2011).  Both obligations
are collectible and payment or compromise of one does not
extinguish or reduce the other.

The court can find no fault in the trustee's failure to
object to the restitution claim and his payment of it, both in
connection with the sale of real properties encumbered by the
United States' lien securing the restitution award and as
proposed in the trustee's plan.

The court further notes that neither debtor filed an
objection to the United States' proof of claim.  See 11 U.S.C. §
502(a).  Because there was no objection, and no basis for one was
apparent, the claim was deemed allowed and properly paid.


**B**

The debtors assert that the trustee, his attorneys, and the
presiding judge are part of a "gang" that has the objective of
destroying the debtors so that they may take the debtors'

1    properties for themselves.

2        This allegation is without any supporting evidence.  It

3    appears both in the recusal motions and the motions to remove the

4    trustee.  Although no basis in fact has even been produced for

5    this accusation, the court spent considerable time reviewing and

6    responding to it in two memorandum decisions dealing with the

7    recusal motions.  Dockets 1148 & 1174.  The court incorporates

8    these decisions by reference.  Id.

9        There is no connection between the trustee, his attorney,

10   the court, and the buyers warranting removal of the trustee or

11   recusal of the presiding judge.

12       The trustee's only connection to the court is that his

13   bankruptcy attorneys (Jason Rios and Donald Fitzgerald) are

14   members of a firm that includes three other attorneys who were

15   formerly associated with a now disbanded large law firm,

16   Diepenbrock, Wulff, Plant & Hannegan, where Judge McManus last

17   practiced law in 1993, prior to taking the bench.  Docket 1148 at

18   14-15.  This 24-year old connection does not warrant removal of

19   the trustee or the presiding judge and it is not evidence that

20   the trustee, his attorneys, and the court are part of a gang.

21       Nor are there connections between the court, the bankruptcy

22   professionals, and the buyers of the properties liquidated by the

23   trustee.

24

25       **C**

26       The debtors contend that the trustee sold their shopping

27   center real properties on the cheap.

28   ///

7

The court has spent considerable time responding to this allegation. In its August 7 memorandum decision denying recusal, the court made it clear that the trustee had not sold the shopping centers below their fair value. The court made extensive and detailed findings of fact and conclusions of law, determining that the properties were sold at a fair value after extensive marketing and pursuant to an in-court auction where multiple competitive offers were received by the trustee. Docket 1148 at 10-12.

When the trustee took control of the estate, the properties were in disrepair, they had numerous deferred maintenance issues, the estate had no cash to adequately address these issues, and Mr. Samuel refused to cooperate with the trustee in the operation of the properties and administration of the estate. Mr. Samuel even tried to hinder the sale of the properties, by seeking a delay so he could present a refinance offer to the trustee. The court denied the request because Mr. Samuel had done nothing to secure refinancing for approximately six to seven months after the trustee took control of the estate. It was only when the trustee sought to sell the properties that Mr. Samuel asked for time to secure a refinance.

The court was unconvinced by Mr. Samuel's challenges to the purchase prices, values of the properties, marketing of the properties, the qualifications of the trustee's real estate broker, or the broker's representation of both the seller and buyer in the transactions. Docket 1148 at 10-11.

Mr. Samuel's appraisals of the properties were not persuasive because his appraiser relied, not on their actual

income, but on potential income assuming the properties were
rehabilitated and fully leased.  The appraisals also failed to
disclose the assumed income streams upon which they relied.
Docket 1148 at 11.

The court rejects the contention that the trustee sold the
properties for less than their fair value.

It is also important to note here that the trustee made a
serious attempt to enter into a compromise with the debtors,
giving them a right of first refusal to purchase two of the four
shopping centers (West Sacramento and Rio Linda centers).  The
trustee was willing to let the debtors have a right of first
refusal to: purchase the West Sacramento center by matching the
highest qualified bid for the center plus $100,000, or paying $4
million, whichever is greater; and purchase the Rio Linda center
for $2,350,000, or such lesser amount as the trustee may agree on
or before the sale hearing.  Docket 634 at 5.

The trustee prepared and filed a motion seeking approval of
the compromise on February 2, 2017.  Docket 634.  Due to the
debtors' failure to go forward with the compromise, however, the
trustee dismissed the motion.  Docket 656.

In other words, if the trustee was indeed attempting to sell
the properties at prices below their fair value, the debtors had
the ideal opportunity to salvage at least two of their shopping
centers by purchasing them from the estate.  It appears the
debtors had sufficient liquidity to accomplish such a transaction
inasmuch as amended Schedule C filed on January 23, 2018
discloses $1,895,000 in retirement accounts.  Docket 999; Cf.
Dockets 65 & 336.  The debtors refused the trustee's offer of

1    compromise.

2        The court concludes that the debtors' real objection to the

3    sales had nothing to do with the sale prices.  Rather, the

4    debtors simply wanted to avoid paying their creditors, especially

5    the claim of the United States.  They viewed bankruptcy only as a

6    place where they could delay their creditors, not pay them.

7    Docket 1121 at 1 (Mr. Samuel admits this case was filed "to

8    obtain temporary relief from garnishments of his real estate

9    escrow funds filed by the United States").

10

11       **D**

12       The trustee was at worst dishonest and at best a poor

13   manager of the estate.

14       The debtors contend that the trustee intentionally depressed

15   the values of the properties in order to permit his "gang" to

16   purchase them at low prices.  As outlined in Section C above and

17   the court's August 7 memorandum decision denying recusal, this

18   contention is without any merit.

19       When appointed, the trustee briefly considered the

20   possibility of refinancing the properties.  Given their disrepair

21   and deferred maintenance issues, given the lack of cash in the

22   estate, and given Mr. Samuel's lack of cooperation, the

23   refinancing option was not viable.  The trustee then retained a

24   broker to market the properties for sale.  Two of the three

25   shopping centers sold in early 2017 received six offers each and

26   one shopping center received nine offers.  The trustee submitted

27   the highest and best offers and overbids were presented at the

28   hearings on the sale motions.  Docket 1148 at 11-12.

1    There is nothing in the record indicating that the trustee

2    did anything to depress the values of the properties.

3    And, as mentioned above, there is no factual basis for the

4    assertion that there is a gang operating in this case to loot the

5    estate.

6    As evidence that the trustee did not properly manage the

7    properties, Mr. Samuel points out that the Stockton Boulevard

8    shopping center was damaged by a fire, a malfunctioning fire

9    suppression system caused water damage at the Rio Linda property,

10   homeless persons congregated on some of the properties, and

11   garbage was allowed to accumulate at the properties.

12   The trustee testified that he does not know how or why the

13   fire at the Stockton Boulevard center started.[2]  The fire

14   destroyed the electrical panel supplying power to the center.  He

15   addressed the fire damage promptly by securing bids for repair of

16   the panel and made an insurance claim.  See also Docket 935 at 4.

17   Mr. Samuel's contention that the trustee started the fire at

18   the Stockton Boulevard center is without any factual foundation.

19   The water damage at the Rio Linda center was addressed in

20   the August 23, 2018 memorandum decision denying recusal.  The

21   damage was caused when a fire suppression system malfunctioned

22

23          [2] In its August 23 Memorandum dealing with the amended

24   recusal motion by Mr. Samuel, the court indicated the parties had
     not advised the court that a fire had damaged one of the

25   properties.  In the context of the motions to remove the trustee,
     however, counsel for the trustee reminded the court that the fire

26   had been disclosed in one of his status reports.  Because no
     relief had been sought concerning the fire, such as approval of a

27   compromise with an insurance company, and because the trustee was
     able to deal with the consequences of the fire in the ordinary

28   course of business, the court did not recall the fire.

and caused the sprinklers to activate.  The malfunction was not
immediately discovered because a sensor that should have detected
the flow of water failed and water accumulated in an unoccupied
sub-level of the property.

When the water damage was discovered, the trustee filed a
motion to authorize a plan to abate, clean up and repair the
water damage, and to settle the claim with the insurance company.
The motion disclosed the damage, the amount of available
insurance, and the cost of abatement, cleanup, repairs and
rebuilding.  Docket 1174 at 7.

When the trustee took control of the estate, the properties
were in serious disrepair.  Roofs leaked, parking lots were in
disrepair, air conditioning units failed, garbage had
accumulated, and homeless persons were encamped on some of the
properties.  The bankruptcy estate had no immediate cash to
adequately address these issues and Mr. Samuel refused to
cooperate with the trustee in the operation of the properties.
As cash became available, the trustee proceeded to make repairs,
clean up the properties, haul garbage, replace lighting, and
discourage homeless encampments.

The court concludes that the trustee did the best he could
to manage the properties, given the financial limitations of the
estate and given Mr. Samuel's ongoing refusal to cooperate him.

The debtors complain that the trustee failed to investigate
a refinance of the shopping center properties.

This is not true.  The court addressed this in its August 7
memorandum decision.  The trustee investigated the possibility of
refinancing the shopping centers shortly after he was appointed.

12

However, their disrepair, serious deferred maintenance issues, lack of cash in the estate, and Mr. Samuel's adamant refusal to cooperate with the trustee, removed refinance as a viable option. Docket 1148 at 10.

Mr. Samuel contends that the trustee attempted to bribe the debtors with a $2 million offer to withdraw their objections to "the Trustee's activities."

There is no evidence of such a bribe other than Mr. Samuel's naked assertion. Mr. Samuel produced no documents, witnesses, or other corroborating information concerning this allegation.

Mr. Samuel may be referring to an aborted compromise he and his attorney attempted to negotiate with the trustee. This compromise is summarized in a motion filed by the trustee and is described briefly above. Docket 634. The trustee offered to grant the debtors a right of first refusal to purchase two of the four shopping centers (West Sacramento and Rio Linda centers). The trustee offered the debtors a right of first refusal to purchase the West Sacramento center by matching the highest qualified bid plus $100,000, or for $4 million, whichever was greater. He also offered them the Rio Linda center for $2,350,000, or such lesser amount as the trustee might agree prior to the sale hearing. Docket 634 at 5. The trustee prepared and filed a motion seeking approval of this compromise on February 2, 2017. Docket 634. Due to the debtors' failure to go forward with the compromise, however, the trustee dismissed the motion. Docket 656.

Mr. Samuel's bribe allegation appears to be nothing more than a pejorative characterization of this abandoned compromise.

The debtors complain that the trustee has not been serving motions and documents on Mrs. Samuel, a federal prison inmate in Texas.

This is not true.  This is addressed in the August 7 memorandum decision.  The court reviewed the docket and concluded that Mrs. Samuel has been served with all documents that were required to be served upon her.  Docket 1148 at 20-21.

Mr. Samuel contends that the trustee hired his son to make repairs and do maintenance at the properties, including the residential properties, paying him $400 per hour.

This allegation has no basis in fact.  Mr. Samuel produced no documents, witnesses, or other corroborating information concerning this allegation.  For example, Mr. Samuel did not identify the trustee's son, his name, the specific work he did, or the property at which he had worked.

On the other hand, the trustee testified that he had not employed his son to do any work on any of the properties.

Mr. Samuel complains that the trustee abandoned four residential properties to the debtors but then continued to collect rent from the tenants in them.

Pursuant to motions by the trustee, the court entered orders in September and October 2016 authorizing the trustee to abandon to the debtors four of the six residential real properties in the estate, 180 Prairie Circle, 186 Prairie Circle, 6924 Pony Trail Way, and 130 Prairie Circle.  See Dockets 319, 320, 355, 366. The remaining two residential properties, 209 Prairie Circle and 148 Estes Way, continue to be part of the bankruptcy estate. ///

As these properties were abandoned back to the debtors, the trustee has not collected rents from the tenants in the properties nor has he otherwise interfered with the debtors' administration of the properties.  If some of these tenants are refusing to pay rent to Mr. Samuel, he is and has been free to evict them.

Mr. Samuel complains that the trustee has not caught up with the mortgage payments on the two residential properties that remain in the estate, 209 Prairie Circle and 148 Estes Way.

This is because the trustee has not obtained confirmation of a plan.  Absent a confirmed plan or an order authorizing payment, the trustee cannot pay pre-petition claims, including mortgage arrears.  The plan the trustee is seeking to confirm will cure all outstanding mortgage and real property tax arrears on these properties.  In the interim, the creditors secured by those properties are prohibited from foreclosing on them by the automatic stay.  <u>See</u> 11 U.S.C. § 362(a).

The court concludes that the trustee has been honest and diligent in his management of the estate.

**E**

The debtors contend that the court has been biased against them.

The court has addressed this contention in detail in its August 7 and 23 memorandum decisions denying recusal.  Docket 1148.  It is without merit.

After the court denied the recusal motions, Mrs. Samuel filed a complaint in the District Court against members of the

1  United States Attorneys Office, the chapter 11 trustee, and the

2  judge presiding in this bankruptcy case.  As to the latter, the

3  false allegations of the recusal motion are repeated.  This

4  development does not warrant recusal for the same reasons the

5  recusal motions were denied and because the complaint is based on

6  the court's judicial acts to which judicial immunity will attach.

7

8     **F**

9     The trustee's plan of liquidation will be confirmed.  The

10  debtors' objections to confirmation will be overruled as they are

11  without merit.

12     11 U.S.C. § 1129 sets forth the requirements for plan

13  confirmation.  As its proponent, the trustee bears the burden of

14  persuasion on each of the elements of section 1129 by a

15  preponderance of the evidence.  <u>United States v. Arnold and Baker</u>

16  <u>Farms (In re Arnold and Baker Farms)</u>, 177 B.R. 648, 654 (B.A.P.

17  9th Cir. 1994); <u>Meyer v. Lepe (In re Lepe)</u>, 470 B.R. 851, 863

18  (B.A.P. 9th Cir. 2012).

19     While the debtors' objections do not reference a specific

20  provision of 11 U.S.C. § 1129, the objections can be construed as

21  a challenge to the requirements that the plan be proposed in good

22  faith and not by any means forbidden by law.  11 U.S.C. §

23  1129(a)(3) prescribes that "[t]he court shall confirm a plan only

24  if . . . [t]he plan has been proposed in good faith and not by

25  any means forbidden by law."

26     As discussed in detail in Sections A through E above, the

27  debtors' arguments have no merit.  When the trustee was

28  appointed, the estate was in disarray.  The shopping center

properties were in disrepair, they had numerous deferred maintenance issues, the estate had no cash to immediately address these issues, the estate had no books or records pertaining to the operations of the properties, and Mr. Samuel refused to cooperate with the trustee in the administration of the estate. The debtors have been also quite hostile to the trustee and his efforts to administer the estate and pay creditors. From courtroom threats and baseless accusations against the trustee, to filing frivolous motions, the debtors have actively obstructed the trustee's administration of the estate.

Notwithstanding these difficulties, the trustee marketed and sold the shopping centers in order to pay creditors. The majority of claims secured by property of the estate have been paid. The trustee's plan now proposes to administer the remaining estate assets and pay the balance of outstanding claims and return any surplus amount to the debtors. The plan has been proposed by the trustee in good faith and not by any means forbidden by law.

The plan also satisfies the remaining provisions of section 1129(a) and (b).

*11 U.S.C. § 1129(a)(1)*

Under section 1129(a)(1), a plan must comply with "the applicable provisions of" the Bankruptcy Code. The applicable provisions are section 1122 (providing guidelines for permissible claim and interest classifications in a plan) and section 1123 (outlining the required and permissible contents of a plan).

The plan complies with section 1122. Under section 1122(a), with the exception of administrative convenience classes covered

under section 1122(b), "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."

While section 1122 provides that dissimilar claims may not be classified together, there is no express prohibition of separate classification of similar claims. Bakarat v. Life Ins. Co. of Va. (In re Bakarat), 99 F.3d 1520, 1524-25 (9th Cir. 1996); Travelers Ins. Co. v. Bryson Properties, XVIII (In re Bryson Properties, XVIII), 961 F.2d 496, 502 (4th Cir. 1992), cert. denied 506 U.S. 866 (1992) (acknowledging that section 1122 "grants some flexibility in classification of unsecured claims").

Yet, most courts will allow separate classification of similar claims only where such classification does not amount to gerrymandering. Id.; see also In re Corcoran Hospital District, 233 B.R. 449, 455 (Bankr. E.D. Cal. 1999) (noting that a business or economic justification is required for the separate classification of unsecured claims).

The court has reviewed the plan's claim and interest classifications and concludes they comply with section 1122.

The plan complies with section 1123 as well. Section 1123(a) prescribes the mandatory plan content requirements and section 1123(b) prescribes the permissive requirements.

Pursuant to section 1123(a)(1), the plan designates classes of claims and interests. See Docket 1234, Plan Art. 2.

Pursuant to section 1123(a)(2), the plan specifies classes of claims or interests that are not impaired. See Docket 1234, Plan Art. 5.

Pursuant to section 1123(a)(3), the plan specifies the treatment of any class of claims or interests that is impaired under the Plan. <u>See</u> Docket 1234, Plan Art. 4.

Pursuant to section 1123(a)(4), the plan provides the same treatment of each class or interest as the treatment of other claims or interests in such class, unless the claim holder has agreed to a less favorable treatment. <u>See</u> Docket 1234, Plan Art. 4.

Pursuant to section 1123(a)(5), the plan provides adequate means for its implementation by continuing the liquidation and/or administration of assets of the estate. <u>See</u> Docket 1234, Plan Art. 6.

Subsections (6) and (7) of section 1123(a) are not applicable because the debtors are not a corporation.

Subsection (8) of section 1123(a) does not apply because earnings from post-petition personal services or other future income of the debtors are not necessary for the execution of the plan and the payment in full of claims.

The plan avails itself of section 1123(b)(1) and (2) by impairing some classes of claim and by giving the plan administrator time to seek assumption or rejection of executory contracts or unexpired leases. <u>See</u> Docket 1234, Plan Art. 8.

*11 U.S.C. § 1129(a)(2)*

Section 1129(a)(2) requires that the proponents of a plan comply with the "applicable provisions" of Title 11. The applicable provisions include the disclosure requirements under section 1125. <u>In re Sierra-Cal</u>, 210 B.R. 168, 176 (Bankr. E.D. Cal. 1997) (stating that section 1125 is an example of what

section 1129(a)(2) is intended to cover); <u>Official Comm. Of</u>
<u>Unsecured Creditors v. Michelson (In re Michelson)</u>, 141 B.R. 715,
719 (Bankr. E.D. Cal. 1992) (stating that "[c]ompliance with the
disclosure and solicitation requirements is the paradigmatic
example of what the Congress had in mind when it enacted section
1129(a)(2)"); H.R. Rep. No. 95-595, at 412 (1977); S. Rep. No.
95-989, at 126 (1978).

   The court has already entered an order determining that the
trustee's disclosure statement "complies with all aspects of
section 1125." Docket 1116 at 2. Subsequent modifications of
the plan have been nonsubstantive and not sufficiently material
so as to require a new disclosure statement.

   *11 U.S.C. § 1129(a)(4)*

   Section 1129(a)(4) requires mandatory disclosure of any
payments for services or for costs and expenses in connection
with the case or plan. The plan must provide that:

   "*Any payment made or to be made by the proponent, by the*
*debtor, or by a person issuing securities or acquiring property*
*under the plan, for services or for costs and expenses in or in*
*connection with the case, or in connection with the plan and*
*incident to the case, has been approved by, or is subject to the*
*approval of, the court as reasonable.*"

   The plan satisfies the requirements of section 1129(a)(4).
The trustee has employed professionals and such employment has
been approved by the court. As the debtors are not in
possession, their employment of professionals is not subject to
court approval. Compensation of the trustee's professionals
remains subject to review and approval by the court.

The plan provides that the plan administrator may employ professionals to the same extent as they could have been employed before plan confirmation by the trustee, except that further court approval for employment shall not be required if the court approved a professional's employment by the trustee before the plan's effective date.  See Docket 1234, Plan Art. 6.

*11 U.S.C. § 1129(a)(5)*

Section 1129(a)(5)(A)(I) requires the plan proponent to disclose "the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan."

Under the plan, the existing trustee, Scott M. Sackett, will serve as the plan administrator.  This has been disclosed by the trustee in the plan.  Docket 1234, Plan Sec. 1.30 & Art. 6. Mr. Sackett's appointment as plan administrator is in the best interests of the creditors and the debtors because he is familiar with and has managed the estate's affairs since May 2016.

*11 U.S.C. § 1129(a)(6)*

Section 1129(a)(6) is not applicable because no regulatory commission and/or rates are implicated in this case.  The debtors are individuals who owned real property on the petition date.

*11 U.S.C. § 1129(a)(7)*

Section 1129(a)(7) requires that the plan be in the best interests of creditors.  This is satisfied if each holder of a claim or interest in each impaired class has accepted the plan, or will receive value, as of the effective date of the plan, that

1  is not less than the amount such holder would receive under

2  liquidation in chapter 7.  See, e.g., Mutual Life Ins. Co. v.

3  Patrician St. Joseph Partners, Ltd. P'ship (In re Patrician St.

4  Joseph Partners Ltd. P'ship), 169 B.R. 669, 679-80 (D. Ariz.

5  1994).

6      Section 1129(a)(7) is satisfied because the plan will pay

7  all unsecured creditors in full.

8      Moreover, each impaired class of claims has voted to accept

9  the plan.  While the sole class of interests held by the debtors

10 have not voted, thereby effectively rejecting the plan, there are

11 no junior classes of claims or interests to the debtors' class 5

12 interests.  In other words, the debtors will receive everything

13 and anything left over after every other claim or interest is

14 satisfied.

15      *11 U.S.C. § 1129(a)(8)*

16      Section 1129(a)(8) provides that a plan may be confirmed if

17 each class of claims or interests has accepted the plan or such

18 claim is not impaired under the plan.  Pursuant to section

19 1126(c), a class accepts a plan if voting creditors holding at

20 least two-thirds in amount and more than one-half in number of

21 the allowed claims of the class that are voted, cast affirmative

22 ballots.

23      Ten of the eleven impaired classes have voted to accept the

24 plan.  Docket 1132.  The debtors' interests are the only class

25 that has not voted (class 5).  While the plan has two additional

26 "impaired" classes (of claims) that have not voted, there are no

27 claims in those classes.

28 ///

Neither of the debtors have cast a ballot.  Docket 1132.  As class 5 consists only of their interests, their failure to cast a ballot is tantamount to rejection of the plan.  This necessitates the invocation of section 1129(b)(1) and (2)(C), which provides that:

"*(1) Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.*

"*(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:*

". . .

"*(C) With respect to a class of interests—*

"*(I) the plan provides that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or*

"*(ii) the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property.*"

As class 5 represents the lowest priority interest and there
are no classes with lower priority interests, section
1129(b)(2)(C)(ii) is satisfied.  Class 5 will be paid the residue
of the estate plus the property claimed exempt as well as the
property already abandoned to the debtors.

The plan does not discriminate unfairly and it is fair and
equitable with respect to the class 5 interests.

*11 U.S.C. § 1129(a)(9)*

Unless claim holders agree to a different treatment, section
1129(a)(9) mandates the treatment of certain administrative and
priority claims.

Holders of administrative claims, as defined in 11 U.S.C. §
507(a)(2) and (3), must receive cash equal to their allowed
amounts on the effective date of the plan.  11 U.S.C. §
1129(a)(9)(A).

For priority claims specified in 11 U.S.C. § 507(a)(1), (4),
(5), (6), or (7), each claim holder must receive cash on the
effective date of the plan equal to the allowed amounts of the
claim.  11 U.S.C. § 1129(a)(9)(B)(ii).  However, these claims may
be paid deferred cash payments equal to the present value of such
claims if the class agrees to such treatment.  11 U.S.C. §
1129(a)(9)(B)(I).

Priority tax claims, as defined in 11 U.S.C. § 507(a)(8),
must be paid in regular cash installments within five years from
the entry of the order for relief and cannot be paid in a manner
less favorable than the most favored nonpriority unsecured claim.
11 U.S.C. § 1129(a)(9)(C), (D).

///

1    The plan provides that all administrative claims shall be
2    paid in full after such claims are approved by the court or on
3    the effective date of the plan, whichever is later, unless the
4    claim holder agrees to different treatment.  See Docket 1234,
5    Plan Art. 3.

6        The plan provides that all priority claims (except tax
7    claims under section 507(a)(8)) shall be paid in full after such
8    claims are allowed or on the effective date, whichever is later,
9    unless a different treatment is agreed to by the claim holder.
10   See Docket 1234, Plan § 4.1.

11       No priority claim will be paid until claims of higher
12   priority under section 507 are paid.  Id.

13       The plan provides that each priority tax claim under section
14   507(a)(8) shall be paid in full after the date such claim is
15   allowed or on the effective date, whichever is later, unless a
16   different treatment is agreed to by the claim holder.

17       11 U.S.C. § 1129(a)(10)

18       Section 1129(a)(10) requires that "at least one class of
19   claims that is impaired under the plan has accepted the plan,"
20   when there is a class of claims impaired under the Chapter 11
21   plan, without including any acceptance by any insider.

22       Classes 2A, 2B, 2D, 2E, 2F, 2G, 2H, 3A, 3C and 4 are all
23   impaired classes and have all voted to accept the plan.  Docket
24   1132.  The plan complies with section 1129(a)(10).

25       11 U.S.C. § 1129(a)(11)

26       Under section 1129(a)(11), the plan proponent must show that
27   plan confirmation is unlikely to be followed by liquidation or
28   further financial reorganization, unless such liquidation or

1  reorganization is provided for in the plan.

2      "That the Plan provides for the eventual liquidation of

3  assets does not preclude confirmation" under section 1129(a)(11).

4  <u>Acequia, Inc. v. Clinton (In re Acequia, Inc.)</u>, 787 F.2d 1352,

5  1364 (9th Cir. 1986).

6      Under the plan, the plan administrator shall continue with

7  administration and liquidation of the post-confirmation estate

8  assets.  <u>See</u> Docket 1234, Plan Art. 6.  The post-confirmation

9  estate is projected to have sufficient funds to meet the

10 obligations of the plan and to conduct an orderly liquidation to

11 maximize the recovery to creditors.  Docket 1135 at 6.  With the

12 cash on hand in the estate, there is ample evidence that the plan

13 has a reasonable probability of success.  Docket 1135 at 6.  This

14 satisfies section 1129(a)(11).

15     *11 U.S.C. § 1129(a)(12)*

16     Section 1129(a)(12) requires that "[a]ll fees payable under

17 section 1930 of title 28, as determined by the court at the

18 hearing on confirmation of the plan, have been paid or the plan

19 provides for the payment of all such fees on the effective date

20 of the plan."  They are fees payable to the U.S. Trustee.

21 Section 507(a)(2) accords such fees priority treatment.

22     The plan satisfies this provision by providing for the

23 payment of any such outstanding fees in full on the plan's

24 effective date.  Subsequent fees will be paid under the plan as

25 they come due.  <u>See</u> Docket 1234, Plan Art. 3 & Art. 6; Docket

26 1135 at 6.

27 ///

28 ///

1    *11 U.S.C. § 1129(a)(13)*

2    Section 1129(a)(13) requires the continuation of retiree

3    benefits.  It does not apply as the estate has no responsibility

4    to provide such benefits.

5    *11 U.S.C. § 1129(a)(14)*

6    Section 1129(a)(14), which concerns domestic support

7    obligation, is inapplicable because no domestic support

8    obligation exists in this case.

9    *11 U.S.C. § 1129(a)(15)*

10   Section 1129(a)(15), triggered by the holder of an allowed

11   unsecured claim objecting to plan confirmation, is inapplicable

12   because there have been no objections by unsecured claim holders.

13   *11 U.S.C. § 1129(a)(16)*

14   Section 1129(a)(16), which concerns non-bankruptcy law

15   governing transfers of property by a corporation or trust, is

16   inapplicable here because no such transfers are involved in this

17   case.

18   *11 U.S.C. § 1141(d)(5)*

19   The plan complies with the discharge requirements of section

20   1141(d)(5).  It provides for the debtors' discharge only after

21   completion of all payments under the plan.  Docket 1234 at 35.

22   The requirements for confirmation of the trustee's plan have

23   been satisfied.  The debtors' objections to confirmation — to the

24   extent they can be construed as such — will be overruled.  The

25   court will confirm the trustee's first amended plan, filed on

26   September 18, 2018.  Docket 1234.

27   ///

28   ///

27

V

The motions for removal of the trustee will be denied.  None
of the reasons for removal of the trustee have a basis in fact.
Even if the court were to consider Mr. Samuel's direct testimony,
it is not credible and does not establish cause for the trustee's
removal.  The trustee has not been incompetent or breached his
fiduciary duty, or failed to perform his duties, nor does he hold
an interest adverse to the estate.

Conversely, the trustee has administered a challenging case,
where the debtors have obstructed his work at every turn in order
to hinder and delay payments to creditors.  From courtroom
threats and baseless accusations against the trustee, to filing
frivolous motions, the debtors have actively obstructed the
trustee's administration of the estate.

The debtors have demonstrated uncompromising contempt for
their statutory obligations as debtors in bankruptcy.  When
removed from their role as the steward of the bankruptcy estate,
they refused any cooperation with the trustee, making an already
challenging case even more so.  Removal of the trustee will be
denied.

The court will confirm the trustee's first amended plan
filed September 18, 2018.

Separate orders will be entered denying each motion to
remove the trustee and confirming the plan.

Dated: September 27, 2018

By the Court

Michael S. McManus
United States Bankruptcy Judge